UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEE SIMMONS,

                Plaintiff,

v.                                    Civil Case No. 14-11855
                                    Honorable Linda V. Parker

CPI APARTMENT FUND
2012, LLC, THE HAYMAN
COMPANY, SUBURBAN
BUILDING SERVICES, INC.,
DANA M. BENAC, and
KRISTEN FIORE,

                Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [ECF NOS. 35 & 36]

Plaintiff Lee Simmons ("Simmons") initiated this lawsuit against

Defendants on May 8, 2014, alleging a failure to accommodate Simmons'

disability, retaliation, and disability discrimination in violation of the federal Fair

Housing Act ("FHA") and the Michigan Persons with Disabilities Civil Rights Act

("PWDCRA"). On February 23, 2015, Defendants filed motions for summary

judgment pursuant to Federal Rule of Civil Procedure 56. The motions have been

fully briefed. Finding the facts and legal arguments sufficiently presented in the

parties' pleadings, the Court dispensed with oral argument pursuant to Eastern

District of Michigan Local Rule 7.1(f) on May 18, 2015.  For the reasons that follow, the Court grants Defendants' motions.

## I.      Factual and Procedural Background

Simmons is paralyzed from the waist down as a result of a spinal cord injury on December 1, 2002.  (Defs.' Mot., Ex. A at 22.)[1]  He was hired by a prior management company in 2009 to work at Carnegie Park Apartments as a pool attendant for the complex's indoor pool.  (*Id*. at 29; Defs.' Mot., Ex. B at 1, 2, & 6.)  Simmons moved into an apartment, unit 722, within the complex at the same time and was given an employee discount where he paid $432 per month on a two-bedroom unit that normally rented for $1,009 per month.  (Defs.' Mot., Ex. B at 22.)

Carnegie Park was built originally as condominiums and a number of units are owned by individuals who pay homeowner association dues.  (*Id*., Ex. A at 57.)  When the recession hit, a company bought up the unsold units and turned them into rental apartments.  (*Id*.)

Beginning in 2012, Simmons began working in Carnegie Park's leasing office on an occasional basis.  (*Id*. at 32.)  He would occasionally lease properties to prospective tenants while also answering phones.  (Defs.' Mot., Ex. C at 73-74.)

---

[1]Except where indicated, citations to Defendants' motion refer to the motion filed by Defendants Hayman Company, U.S. Suburban Services, Kristen Fiore, and Dana Benac.  (*See* ECF No. 35.)

Defendant Dana Benac ("Benac") worked at Carnegie Park as well and became the property manager shortly before January 2013.  (*Id*. at 14.)

In January 2013, Defendant Hayman Company ("Hayman") took over the management contract for Carnegie Park following the purchase of the property by Defendant CPI Apartment Fund, 2012, LLC ("CPI").  (*Id*., Ex. C at 13.)  Hayman continued the employment of the Carnegie Park employees who worked for the previous management company, including Simmons and Benac.[2]

In October 2013, Defendant Kristen Fiore ("Fiore") became the Hayman Regional Director and her territory included Carnegie Park.  (*Id*., Ex. D ¶ 2.)  Fiore did not work on-site at Carnegie Park until around November or December 2013. (*Id*.)  At about that time and until approximately January 2014, Fiore undertook a budget review to "improve efficiencies and operations at Carnegie Park and maximize resident safety and satisfaction."  (*Id*. ¶ 4.)  Based on her review, Fiore determined that Carnegie Park did not have sufficient maintenance staff.  (*Id*. ¶ 5.) Fiore felt that the existing two maintenance technicians could not handle all maintenance tasks, keep the common areas safe and secure, and handle snow and ice removal during the winter.  (*Id*. ¶ 6.)  Fiore therefore decided that Carnegie

---

[2] According to Defendants, Defendant U.S. Suburban Building Services, Inc. actually employed Simmons (and presumably the other Carnegie Park employees), although his employment was directed by a Hyman regional director.  (*See* Defs.' Mot. at Pg ID 266 n.1.)

Park needed a third maintenance technician.  (*Id*. ¶ 7.)  To pay for this new

position, Fiore identified three existing positions she believed could be eliminated.

Fiore determined that there was no need for a full-time painter and decided

to eliminate that position which was held by Travis Hammond.  (*Id*. ¶ 7b.)  Fiore

also decided to install a security camera and key fob system at the pool-- at a cost

of approximately $2,500-- which eliminated the need for a pool attendant and

provided the added benefit of allowing twenty-four hour indoor pool access.  (*Id*.

¶ 7a.)  Finally, Fiore determined that there was no need for an Assistant Manager

and the employee in that position, Carole Brown, was demoted to Leasing Agent

with a $4.50 reduction in pay.  (*Id*. ¶¶ 7c, 10.)  Defendants indicate that neither

Hammond nor Brown is disabled.

Once the positions were eliminated, a third maintenance technician was

hired.  At this time, a part-time leasing agent also was hired to work weekends.

Benac and Fiore testified that Simmons was not considered for the latter position in

part because he previously had requested to not work weekends after he acquired

custody of his daughter.  (Defs.' Mot., Ex. C at 174-75; Ex. G at 58.)  Simmons

also was not considered for the position based on information Defendants received

regarding his activities as a real estate agent.

In December 2013, around the time Fiore was making restructuring

decisions, Thomas Doyle, a member of the board of Carnegie Park's condominium

4

association, complained that Simmons was working in the leasing office when he also was a real estate agent.  (Defs.' Mot., Ex. C at 62-65.)  Apparently Simmons had acquired his real estate license in April 2013.  (*Id*., Ex. B at 10.)  Fiore was initially unaware that Simmons was working in the office at all and thought he only worked as the pool attendant.  (*Id*., Ex. G at 126.)  Although Benac was aware that Simmons had his real estate license, she did not know he was actively selling real estate.  (*Id*., Ex. C at 67.)  Doyle, Fiore, and Benac felt that Simmons' activities created a conflict of interest, as he had access to inside information working in the leasing office that benefitted him as a real estate agent.  (*Id*., Ex. C at 65-66, 68-69; Ex. G at 16-17.)  Simmons in fact sold several condominiums to would-be-renters at Carnegie Park.  (*Id*., Ex. A at 60-61.)  Benac testified that if she had known Simmons was selling condominiums in Carnegie Park while working in the rental office, she would have contacted the corporate office and recommended that he be terminated.  (*Id*., Ex. C at 174.)

The key fob system and security cameras were installed at Carnegie Park's indoor pool on or about February 19, 2014, and Simmons' employment was terminated effective March 8, 2014.  (Defs.' Mot., Ex. D ¶ 8.)  Fiore agreed, however, to continue a rental discount for Simmons even though he was no longer an employee.  (*Id*. ¶ 9.)  On March 4, 2014, Simmons signed a new month-to-month lease at Carnegie Park pursuant to which he received a $50 per month

5

discount and a waiver of the $150 fee charged for a month-to-month lease.  (*Id*., Ex. A at 79; Ex. 9 ¶ 11.)

Prior to that date, on February 22, 2014, some water had entered Simmons' apartment due to melting snow and ice.  Defendants hired OneWay Restoration to extract the water and treat the area with Bio Kill to ensure that there was no mold growth.  (Defs.' Mot., Ex. H at Pg ID 427.)  On March 17, 2014, melting snow and ice from a large ice dam that had formed behind the apartment row caused additional water to leak into Simmons' apartment, as well as two other units on his row.  (*Id*. at Pg ID 428-33.)  OneWay Restoration again was called in to extract the water and treat the affected area to prevent mold.  (*Id*., Ex. H at Pg ID 428-30; Ex. A at 82.) Simmons' furniture was moved up on blocks to stay dry.  (*Id*., Ex. H at Pg ID 428; Ex. A at 80.)

Two of Simmons' neighbors also had flooding issues related to the ice dam. (*Id*., Ex. A at 83; Ex. C at 106.)  Those tenants moved out of their apartments, with one being allowed to cancel their lease with no penalty.  (*Id*., Ex. C at 106-07.) Defendants did not otherwise assist those tenants in any way when they moved out of the complex.  (*Id*., Ex. C at 106-07.)  Simmons spoke with Fiore around March 19, at which time he was offered three options: (1) temporarily move to a fully furnished penthouse model unit while his unit was being repaired, (2) permanently

move to an unfurnished penthouse at market rate, or (3) be released him from his lease with no penalty.  (*Id*., Ex. G at 21-22.)

On March 20, Simmons sent a letter addressed to "Management" at Carnegie Park, complaining that "[r]egional management has stated that since the property has no standard 2 bedroom apartments, I must pay an extra $200.00 monthly to transfer to a comparable 2 bedroom apartment to maintain the habitable conditions that are lawfully due to me in the current lease agreement."  (*Id*., Ex. I at Pg ID 435.)  In his letter, Simmons refers to Carnegie Park's obligations "under State and Federal laws to provide safe and habitable conditions" and asserts that flooding has made his apartment "uninhabitable" and an "immediate health and safety risk[] for [his] family."  (*Id*.)  Nowhere in the letter does Simmons refer to his disability or claim that he needs an accommodation.

Around the same time, Simmons also contacted Gerald Witkowski, head of Code Enforcement for the City of Southfield (where Carnegie Park is located).  (*Id*., Ex. J ¶ 2.)  According to Witkowski, Simmons called the city regarding the flooding situation at this apartment, indicating that he wanted to move to a different apartment within the Carnegie Park complex.  (*Id*. ¶¶ 3, 4.)  Witkowski then contacted Carnegie Park and was told that Simmons had been offered a bigger apartment at the same rental rate that he had been paying.  (*Id*. ¶ 4.)

On March 21, 2014, Fiore wrote Simmons, confirming the three options she previously had offered him.  (Defs.' Mot., Ex. I at Pg ID 436.)  Simmons indicated that he was going to accept the offer to move into the furnished penthouse model. Simmons apparently then contacted Witkowski from the City of Southfield about having the apartment complex move his belongings.  (*Id*. Ex. J ¶ 5.)  Witkowski offered to gather volunteers from Southfield to help Simmons move.  (*Id*. ¶ 6.) Witkowski then spoke with Fiore, who, according to Witkowski, indicated that the complex would move Simmons' belongings.  (*Id*. ¶ 7.)

Thereafter, but still on March 21, 2014, Simmons signed an agreement to move into the penthouse model, "to live temporarily while [his] current apartment is being repaired and is returned to normal living status."  (*Id*., Ex. I at Pg ID 437.) The penthouse model has more square footage than Simmons' unit, with vaulted ceilings and a fireplace.  (*Id*., Ex. A at 85-86.)  The March 21 agreement provided that Carnegie Park maintenance staff would move Simmons' and his daughter's beds to the penthouse model and that no other belongings would be moved by the staff.  (*Id*., Ex. I at Pg ID 437.)

Benac instructed Joe Alverson, a member of Carnegie Park's maintenance staff, to move Simmons' furniture.  (*Id*., Ex. L at 25, 52.)  When Alverson went to Simmons' existing unit, however, Simmons said that he did not want to keep any of the furniture and instructed Alverson to move none of it.  (*Id*. at 25; Ex. A at 94-

8

95.)  Simmons claimed the furniture was ruined by the water.  (*Id.*, Ex. A at 95.)
Alverson did move Simmons' other belongings that Simmons wanted moved to the
new apartment.  (*Id.*, Ex. A at 96.; Ex. L at 26.)

As reflected in the agreement signed by Simmons on March 21, the move to
the penthouse model was intended to be temporary.  Simmons and Benac discussed
a permanent move to a new first floor two-bedroom apartment that would have
been identical to Simmons' old unit.  (*Id.*, Ex. I at 153; *see also* Ex. A at 107-111.)
On April 8, 2014, after trying to communicate with Simmons via text about a unit
that had become available and receiving no response from Simmons, Benac posted
a note on the door of the penthouse model, informing Simmons of the available
unit and inquiring whether he was still interested in this transfer or had changed his
mind and found different accommodations.  (*Id.*, Ex. I at Pg ID 439-442.)

The following day, Benac received a call from Kiesha Speech, District
Director for Michigan's 35th District Representative Rudy Hobbs.  (Defs.' Mot.,
Ex. M at Pg ID 470.)  Speech followed up the call with an email to Benac, in
which Speech indicated that she was contacting Carnegie Park regarding Simmons,
who had reached out to Hobbs' "office for assistance after experiencing flooding in
his apartment."  (*Id.*)  Speech also wrote:

> Mr. Simmons explained that he was moved to a temporary living
> arrangement and that accommodations have been made for him . . . At
> this point, Mr. Simmons does want to transfer to another apartment
> within in [sic] your complex, per your offer, and to continue in the

> [m]onth-to-[m]onth agreement with your property.  However, due to his situation (current limited finances, physical impairments, and family responsibilities) and the unexpected inconveniences that the flooding caused to his family, I'd like to ask if the property would consider assisting Mr. Simmons with 1) moving his family and belongings fully into the new location and, 2) disposing of any unusable items in the previous unit.

(*Id*.)  Benac forwarded the inquiry to Fiore, who, in an email to Speech on April 10, 2014, responded in part:

> At this time I feel that we have made every accommodation necessary. To date we still have not heard from Mr. Simmons that he wants to move forward with the transfer.  The additional items that you are requesting should be referred to his rental insurance company, as they would be outlined in his policy coverage.

(*Id*. at Pg ID 472.)  As Fiore explains in an affidavit submitted in support of Defendants' summary judgment motion, she was concerned that Simmons had a renters' insurance claim regarding the furniture he claimed was ruined and that if Carnegie Park personnel disposed of the furniture in Simmons' flooded unit, Carnegie Park might be liable for some sort of destruction of evidence.  (Defs.' Mot., Ex. D ¶¶ 14, 15.)  Fiore indicates that she explained this concern to Speech and Speech never mentioned the issue again or indicated whether or not Simmons' had a renters' insurance claim pending. (*Id*. ¶ 16.)

On April 14, 2014, after hearing nothing further regarding Simmons' intentions, Benac sent an email to Speech in which she wrote:

> I would like to follow up with you regarding the status of Mr. Simmons [sic] transfer.  My Regional Manager, Kristen Fiore,

responded to your requests last week, and we have not received a
response back from you regarding our next steps.  I spoke with Mr.
Simmons towards the end of last week, and he stated that everything
should be discussed with you as you are dealing with this on his
behalf.  I would like to know if Mr. Simmons will be transfering [sic]
to the new unit that we offered him, or if he is making other
arrangements.  Please advise.

(Defs.' Mot., Ex. M at Pg ID 473.)  Speech responded the next day, indicating that

she "was under the impression that Mr. Simmons would be speaking with you

[Benac] and finalizing the details of his move . . .."  (*Id*. at Pg ID 474.)  Speech

wrote that she believed Simmons wanted to move into the unit Carnegie Park had

prepared for him, but that he wanted about three additional weeks in the model unit

to obtain furniture for the new, unfurnished unit.[3]  (*Id*.)  Fiore agreed to give

Simmons ten days (i.e., until April 25, 2014) to return the keys to the model unit.

(*Id*. at Pg ID 475.)  In her affidavit submitted in support of Defendants' motion,

Fiore indicates that on March 15, 2014, when she sent the email to Speech, she

anticipated that Carnegie Park would have to file eviction documents if Simmons

did not move out by the deadline conveyed to Speech.  (Defs.' Mot., Ex. D ¶ 17.)

Simmons and Benac spoke on April 16, 2014, however, and Simmons indicated

---

[3] Although Defendants do not mention it in their factual recitation, Benac wrote a
letter to Simmons on April 8, 2014, in which she informed Simmons that if he
wanted the two bedroom unit, he needed to sign a lease for the unit on April 12,
2014 and turn in the keys to the penthouse model by April 15, 2014.  (Defs.' Mot.,
Ex. I at Pg ID 444.)  Defendants do not indicate whether this letter was delivered to
Simmons; however communications between Defendants and Speaks reflect that
these deadlines were somehow conveyed.

that he would be able to move by April 21 and was fine with the situation.  (*Id.*, Ex. M at Pg ID 476-77.)

Nevertheless, as of April 23, 2014, Simmons had neither signed his new lease nor picked up the keys for the new unit.  (*Id.* at 477.)  Benac therefore sent an email to Speech, asking if she could inform Carnegie Park of Simmons' intentions.  (*Id.*)  Speech emailed Simmons the following day, reminding him of the next days' deadline to turn in the keys to the penthouse model and encouraging him to communicate his intentions to Carnegie Park about moving into the new unit.  (*Id.*, Ex. N at Pg ID 489.)  In her email, Speech also informed Simmons that St. Vincent de Paul could help with his furniture needs.  (*Id.*)  Simmons did not respond to Speech or contact Carnegie Park about his plans.

Instead, on April 25, 2014, Simmons' current attorney, Paul Christensen, sent a letter to Fiore and Benac.  (Defs.' Mot., Ex. P.)  Christensen indicated that he had been retained by Simmons "to pursue his legal remedies arising out of the water damage to his apartment, furniture and other personal property."  (*Id.*)  Christensen instructed that all communications should be directed to him.  (*Id.*)  He also charged Carnegie Park with threatening to force Simmons out of the penthouse model and into a different apartment "[i]n violation of the [March 21, 2014] agreement [between Carnegie Park and Simmons]."  (*Id.*)  Christensen stated that Simmons did not agree to change the terms of the agreement which allowed

12

him to stay in the penthouse model at his then current rental rate until his flooded apartment is repaired and returned to normal living status.  (*Id*.)  He further asserted that Carnegie Park had refused to move Simmons' furniture out of the water damaged apartment and was refusing to compensate him for his losses.  (*Id*.)

In his letter, Christensen demanded that Carnegie Park reimburse Simmons in the amount of $15,000 for the loss of his property, moving expense, and the expenses associated with removing and discarding his old furniture.  (*Id*.) Christensen concluded by indicating that Simmons would remain in the penthouse unit until then and that if Carnegie Park "take[s] any further action in violation of the agreement, then Mr. Simmons will avail himself of all legal remedies, including for your violation of his Civil Rights and for any retaliatory conduct." (*Id*.)

Carnegie Park's landlord-tenant attorney, I. Matthew Miller, responded to the letter on April 25, 2014.  (*Id*., Ex. Q.)  Miller indicated that, based on his review of the correspondence between Carnegie Park and Simmons (or those people speaking on his behalf), the last agreement between the parties was that Simmons would move into a new two-bedroom unit, which had been made ready and available for him two weeks earlier.  (*Id*.)  Miller wrote that Simmons was occupying the model without paying the appropriate rent for it, that his refusal to remove his belongings from the original flooded apartment was preventing

13

Carnegie Park from repairing and refurbishing it, and that Carnegie Park was holding the new apartment for him which prevented it from leasing it to another resident. (*Id*.) Miller asserted that Carnegie Park has no legal obligation to move Simmons' belongings for him, but had agreed to move two beds for Simmons, even though he subsequently changed his mind. (*Id*.) Miller further pointed out that pursuant to the March 1, 2014 lease signed by Simmons , Carnegie Park was not responsible for any damage to Simmons' personal property caused by the flooding. (*Id*.; *see also* Defs.' Mot., Ex. R ¶ 8, Pg ID 502.)

In the letter to Christensen, Miller enclosed two notices to quit that were being sent to Simmons that day. (*Id*.) One was a notice to quit to terminate Simmons' tenancy in the model; the other was a 7-day notice for health hazard and damage to the premises demanding that Simmons remove his belongings from the original flooded unit to allow Carnegie Park to remediate and refurbish the unit. Miller conveyed that if Simmons did not do both, Carnegie Park may exercise its rights to pursue his evictions. (*Id*.) Miller closed the letter by offering to allow Simmons to remain at Carnegie Park by moving into the new unit. (*Id*.) He indicated that the apartment would be held for Simmons until noon on April 29, 2014, and that the offer would be rescinded unless, by that date and time, he: (1) signed a new lease for the new apartment; (2) vacates the model; (3) removed his

14

belongings from the original apartment; and (4) signed a full and complete release. (*Id*.)

Simmons did not take any of these actions by the deadline.  Instead, on May 8, 2014, he filed this lawsuit alleging the following counts: (I) refusal to make reasonable accommodations in violation of the FHA by Hayman, Suburban Building Services, Inc. ("SBS"), and CPI; (II) retaliation in violation of the FHA by Hayman, SBS, and CPI; (III) refusal to permit accommodations in violation of the PWDCRA by all Defendants; (IV) retaliation in violation of the PWDCRA by all Defendants; and (V) employment discrimination based on disability in violation of the PWDCRA by all Defendants.[4]  (ECF No. 1.)

On May 12, 2014, Defendants filed and served Simmons with a complaint for eviction from the flooded unit.  (Pl.'s Resp., Ex. L.)  At a May 30, 2014 hearing with respect to that complaint, a state court district judge entered a judgment for possession concluding that the plain and unambiguous terms of the lease agreement for the unit allowed the landlord to terminate the lease with thirty days'

---

[4] In his brief in response to Defendants' summary judgment motions, Simmons includes a section titled "Rental laws are also broadly construed" under which he alleges various violations by Defendants of their duties under Michigan landlord-tenant law.  (Pl.'s Resp. Br. at 19-20.)  As indicated, Simmons does not allege violations of these laws in his Complaint.  A plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing cases).

notice, which had expired, and that two grounds for summary of recovery of possession existed under Michigan law.  (*Id.*, Ex. N.)  Simmons filed an appeal.

On June 9, 2014, Defendants filed a complaint to evict Simmons from the penthouse unit.  That action and the previous action were subsequently voluntarily dismissed, however.

On February 23, 2015, Hayman, SBS, Benac, and Fiore filed a motion for summary judgment in the present action, in which they argue that Simmons cannot establish the elements of his claims.  (ECF No. 35.)  On the same date, CPI filed a summary judgment motion asserting the same arguments but also claiming that Simmons' employment discrimination claim does not apply to CPI because it does not have employees, did not have the control or authority to affect Simmons' employment, and did not take any adverse employment action against Simmons. (ECF No. 36.)  As indicated earlier, the motions have been fully briefed.

## II.   Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

16

242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56

mandates summary judgment against a party who fails to establish the existence of

an element essential to that party's case and on which that party bears the burden

of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine

issue of material fact."  *Id*. at 323. Once the movant meets this burden, the

"nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To

demonstrate a genuine issue, the nonmoving party must present sufficient evidence

upon which a jury could reasonably find for that party; a "scintilla of evidence" is

insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must

designate specifically the materials in the record supporting the assertion,

"including depositions, documents, electronically stored information, affidavits or

declarations, stipulations, admissions, interrogatory answers, or other materials."

Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence

and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*,

477 U.S. at 255.

17

## III.   Applicable Law and Analysis

### A.   Disability Discrimination

Simmons claims that his termination constituted disability discrimination in violation of the PWDCRA.[5]  Absent direct evidence of disability discrimination, as is the case here, a court must evaluate a plaintiff's claims under the PWDCRA by applying the familiar burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *Hazle v. Ford Motor Co*., 628 N.W.2d 515, 520-21 (Mich. 2001).  First, the plaintiff must establish a prima facie case of discrimination by presenting evidence that: (1) he is disabled as defined by the act or that the defendant regarded him as disabled; (2) the alleged disability is unrelated to his ability to perform the job; and (3) he was

---

[5] In his Complaint, Simmons lists the following as examples of disability discrimination he experienced during the course of his employment: the failure and/or refusal to promote him, reductions of his hours, failure to provide pay raises, and his termination.  (Compl. ¶ 114.)  Defendants identify reasons why none of these alleged actions or inactions constitutes disability discrimination in their summary judgment motion.  For example, at his deposition, Simmons indicated that his failure to promote claim is based on the failure to promote him rather than Carole Browne to the assistant manager position.  (Defs.' Mot., Ex. A at 68.)  Brown was hired for the assistant manager position, however, before CPI purchased Carnegie Park and Hayman began managing the property.  (*Id*., Ex. F; Ex. T ¶¶ 2, 3.)  As Defendants point out, the reduction in Simmons' work hours resulted in part from Hayman's need to cut back office hours and Simmons' desire for fewer hours after receiving full custody of his daughter in 2013.  (*Id*., Ex. C at 90; Ex. A at 42.)  In response to Defendants' motion, Simmons addresses only his termination.  Thus the Court assumes that he is abandoning his disability discrimination claim based on any other alleged employment decision listed in his Complaint.  In any event, the claim fails based on those actions for the reasons stated by Defendants.

discriminated against in one of the ways described by the statute, such as being discharged because of a disability.[6] *Lown v. JJ Eaton Place*, 598 N.W.2d 633, 636 (Mich. Ct. App. 1999); *Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 405-06 (Mich. Ct. App. 1999). With respect to the third prong-- which appears to be the only element at issue-- "[t]he plaintiff's disability must be a 'but for' cause of the adverse employment action." *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014) (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc)). Under that standard, it is not enough that the disability was a "motivating factor." *Lewis*, 681 F.3d at 321. There is no evidence here that Simmons' disability was a cause, much less a "but for" cause, of his termination.

In order to budget for what Defendants' determined was a much needed maintenance technician, Fiore concluded that three positions needed to be eliminated: the pool attendant, the painter, and the assistant manager.[7] Simmons was hired to work at Carnegie Park as the pool attendant. (Defs.' Mot., Ex. B at Pg ID 376.) Even if he also did some work as a leasing agent, at least as far as Fiore knew when she made the termination decisions, his job duties related to the pool,

---

[6] Michigan Compiled Laws Section 37.1202 sets forth the conduct prohibited by an employer based on an individual's disability, including discharge.

[7] As the Sixth Circuit has often stated: " '[I]t is inappropriate for the judiciary to substitute its judgment for that of management.' " *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)).

only.[8]  (Defs.' Mot., Ex. C at 73; Pl.'s Resp. Ex. B at 126.)  The employees holding the other terminated positions were not disabled.  Simmons fails to present any evidence to suggest that his disability was a factor in the decision to terminate him.

For these reasons, Defendants are entitled to summary judgment with respect to Simmons' disability discrimination claim.

## B.    Failure to Accommodate

Simmons alleges that Defendants failed to accommodate him in violation of the FHA, 42 U.S.C. § 3604(f)(3)(B), and the PWDCRA, Michigan Compiled Laws § 37.1506.

Under the FHA, it is unlawful to discriminate against "any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling," on the basis of that person's disability.  42 U.S.C. § 3604(f)(2)(A).  Discrimination prohibited by the FHA includes the refusal to make reasonable accommodations in "rules, policies, practices, or services, when such accommodations may be necessary to afford [the disabled individual] equal opportunity to use and enjoy a dwelling." 42 U.S.C.

---

[8] Even if Simmons was a leasing agent, Defendants present evidence to show that he would not have been retained in that position either.  First, Brown was demoted from Assistant Manager to full-time leasing agent and, according to Defendants, she had more experience and was senior to Simmons.  While Defendants also hired a part-time leasing agent to work weekends, it is undisputed that Simmons told Benac he did not want to work weekends in order to spend time with his daughter. (*Id*., Ex. C at 175.)

§ 3604(f)(3)(B).  The operative elements of a failure-to-accommodate claim are

"reasonable", "necessary", and "equal opportunity."  *Howard v. City of*

*Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002).

As the Sixth Circuit Court of Appeals explained in *Groner v. Golden Gate*

*Gardens Apartments*, 250 F.3d 1039 (6th Cir. 2001):

> Accommodations required under the Act must be both
> reasonable and necessary to afford the handicapped individual an
> equal opportunity to use and enjoy a dwelling.  *See Smith & Lee*
> *Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 795-96 (6th Cir. 1996)
> (holding that the city had violated the Fair Housing Act by failing to
> allow adult foster care homes to operate in areas zoned for single-
> family neighborhoods).  An accommodation is reasonable when it
> imposes no "fundamental alteration in the nature of a program" or
> "undue financial and administrative burdens."  *Id.* at 795.
>
> Whether a requested accommodation is required by law is
> "highly fact-specific, requiring case-by-case determination." *[United*
> *States v.] California Mobile Home Park*, 29 F.3d [1413], 1418 [(9th
> Cir. 1994)]; *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1104
> (3d Cir. 1996).  Courts generally balance the burdens imposed on the
> defendant by the contemplated accommodation against the benefits to
> the plaintiff.  *See  Smith & Lee Assocs.*, 102 F.3d at 795. In
> determining whether the reasonableness requirement has been met, a
> court may consider the accommodation's functional and
> administrative aspects, as well as its costs.  *See  Bryant Woods Inn,*
> *Inc. v. Howard County*, 124 F.3d 597, 604 (4th Cir. 1997).

*Groner*, 250 F.3d at 1043-1044.  The Michigan courts have similarly construed a

landlord's duty to accommodate a disabled tenant under the PWDCRA.  *See, e.g.,*

*Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415, 414-15 (Mich. Ct. App. 2002)

(concluding that "a landlord is not required to accommodate a disabled tenant's

every request unless it imposes an undue hardship. Instead, the landlord's duty to

accommodate requires those reasonable accommodations necessary for the

disabled tenant's enjoyment of the premises as they relate to 'rules, policies,

practices, or services' and then only when the accommodations will not result in an

undue hardship on the landlord.").

Therefore, to establish a failure-to-accommodate claim, the plaintiff must

prove that:

> (1) []he suffers from a disability within the meaning of [the] FHA; (2)
> the defendant knew or reasonably should have known of the
> disability; (3) the requested accommodation may be necessary to
> afford "an equal opportunity to use and enjoy the dwelling;" (4) the
> accommodation is reasonable; and (5) the defendant refused to make
> the accommodation.

*Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 (6th Cir. 2001); *see*

*also Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir.

2014).  Discussing the third requirement, the Sixth Circuit has explained that

" '[e]qual opportunity' means that disabled individuals are entitled to live in the

same residences and communities as non-disabled individuals, insofar as that can

be accomplished through a reasonable accommodation or modification."  *Hollis*,

760 F.3d at 541 (citing *Smith & Lee Assoc.*, 102 F.3d at 795).  "Thus, an FHA

reasonable-modification . . . plaintiff must show that, but for the requested

accommodation . . . , he 'likely will be denied an equal opportunity to enjoy the

housing of [his] choice."  *Id*. (citing *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir.

22

1995)).  Stated differently, the plaintiff must show that the requested modification "would redress injuries that otherwise would prevent a disable resident from receiving the same enjoyment from the property as a non-disabled person would receive."  *Id.* (citing *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006)).

Simmons asserts that Defendants violated the FHA and PWDCRA by failing to provide him moving services when his apartment flooded.  Carnegie Park does not offer moving services to any tenant, however.  As indicated, the complex also provided no assistance to the tenants of the two other units whose apartments flooded.  As such, Simmons' request for assistance moving would require a fundamental alteration in the nature of Carnegie Park's operations.[9]  Moreover,

---

[9]This conclusion is supported by an example provided in a Joint Statement from the United States Department of Justice and United States Department of Housing and Urban Development, attached to Defendants' motion:

> A tenant has a severe mobility impairment that substantially limits his ability to walk.  He asks his housing provider to transport him to the grocery store and assist him with his grocery shopping as a reasonable accommodation to his disability.  The provider does not provide any transportation or shopping services for its tenants, so granting this request would require a fundamental alteration in the nature of the provider's operations. The request can be denied, but the provider should discuss with the requester whether there is any alternative accommodation that would effectively meet the requester's disability-related needs without fundamentally altering the nature of its operations, such as reducing the tenant's need to walk long distances by altering its parking policy to allow a volunteer from a local community service organization to park her car close to the tenant's

Simmons was not requesting an accommodation that was necessary to afford him "an equal opportunity to use and enjoy [Carnegie Park]." Notably, as Defendants point out, Simmons did not require moving assistance from Carnegie Park or its maintenance staff when he first moved into Carnegie Park apartments. (*See* Defs.' Mot., Ex. W ¶ 3.) "[A]n accommodation should not extend a preference to disabled tenants relative to other tenants, as opposed to affording them equal opportunity, and accommodations that go beyond affording a tenant with a disability an [equal] opportunity to use and enjoy a dwelling are not required by the [FHA]." *Bachman*, 653 N.W.2d at 429 (citing *Sporn v. Ocean Colony Condominium Ass'n*, 173 F. Supp. 2d 244, 250 (D.N.J. 2001)).

In any event, the evidence establishes that Defendants in fact offered to help Simmons move out of the flooded unit and sent a maintenance employee to move his belongings. Simmons, however, instructed the employee to not move any furniture because he claimed it was too damaged by the water. He did get assistance from Carnegie Park's maintenance staff to move his other belongings, however.

For these reasons, the Court finds that Defendants are entitled to summary judgment with respect to Simmons' failure to accommodate claims.

---

unit so she can transport the tenant to the grocery store and assist him with his shopping.

(Defs.' Mot., Ex. V at Pg ID 514.)

## C.    Retaliation

Simmons claims that Defendants retaliated against him for engaging in his rights under the FHA and PWDCRA.  The *McDonnell-Douglas* burden shifting rules apply to these claims as well.  *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001); *Aho v. Dep't of Corrections*, 688 N.W.2d 104, 108-09 (Mich. Ct. App. 2004); *Robbins v. Am. Preferred Mgmt.*, No. 5:05-cv-182, 2007 WL 2728746, at *11 (W.D. Mich. Sept. 17, 2007).

To establish a prima facie case of unlawful retaliation under the PWDCRA, a plaintiff must show:

> (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an . . . action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse . . . action.

*Bachman*, 653 N.W.2d at 437 (internal quotation marks and citations omitted).  A prima facie case of retaliation under the FHA requires essentially similar proof: (1) that the plaintiff exercised or enjoyed a right guaranteed by the FHA; (2) that the defendant's intentional conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection existed between the plaintiff's exercise or enjoyment of a right and the defendant's conduct.  *Hood v. Midwest Sav. Bank*, 95 F. App'x 768, 779 (6th Cir. 2004).  To constitute retaliation, the defendant must have had actual knowledge of the plaintiff's protected activity when the defendant

engaged in the coercion, intimidation, threat, or interference. *See Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir. 1996).

In his Complaint, Simmons identifies several acts allegedly committed by Defendants in retaliation for his engagement in protected activity. (*See* Compl. ¶ 72.) Almost all of those acts allegedly occurred, however, before Simmons engaged in any protected activity or exercised or enjoyed a right guaranteed by the FHA. Under the PWDCRA, a person is said to have engaged in protected activity if the person opposed a violation of the act or makes a charge, files a complaint, or testifies, assists, or participates in an investigation, proceeding, or hearing under the act. *Bachman*, 653 N.W.2d at 437 (citing Mich. Comp. Laws § 37.1602(a)). A request for an accommodation does not constitute protected activity under the PWDCRA. *Id*. at 438. Nothing indicated to Defendants that Simmons was exercising his fair housing rights before his lawyer sent a letter to Benac and Fiore on April 25, 2014, and even then there was only a vague reference to violations of Simmons' "civil rights." Even if that letter put Defendants on notice that Simmons was exercising his rights under the FHA, Simmons cannot establish a causal connection between that conduct and anything Defendants did thereafter.

The evidence reflects that Simmons had until April 15, 2014 to turn in the keys to the penthouse unit. (Defs.' Mot., Ex. I at Pg ID 444; *see also* Ex. M at Pg ID 474.) Simmons did not do so. Instead, he requested through Speaks another

26

three weeks to move.  On April 15, Fiore communicated to Speaks that Simmons could have ten extra days or until April 25.  (*Id.*, Ex. M at Pg ID 475.)  According to Fiore, when she extended the deadline, she anticipated that Defendants would have to file eviction documents to get Simmons out of the penthouse unit if he still had not moved by the new deadline.  (Defs.' Mot., Ex. D.)

Simmons did not move out of the penthouse unit by April 25, 2014, despite the fact that he entered an agreement to *temporarily* move into that unit, then agreed to move to a two-bedroom unit comparable to his flooded unit, and had been granted additional time to move.  Defendants, through their counsel, extended the deadline for Simmons to vacate the model unit once more to April 29, 2014. Still he did not move.  Thus Defendants had a legitimate, non-discriminatory reason for pursuing eviction proceedings.  Simmons fails to demonstrate that the legitimate reason was not the true reason, but was only a pretext for retaliation.

As such, the Court concludes that Defendants also are entitled to summary judgment with respect to Simmons' retaliation claims.

## IV.   Conclusion

For the reasons stated, the Court holds that Simmons fails to demonstrate the elements of his reasonable accommodation or retaliation claims under the FHA or PWDCRA or his disability discrimination claim under the PWDCRA.  As such,

27

the Court finds it unnecessary to address CPI's alternative argument for dismissal

of Simmons' discrimination claim (i.e., that it is not an employer under the statute).

Accordingly,

**IT IS ORDERED**, that Defendants' motions for summary judgment (ECF

Nos. 35 and 36) are **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: May 22, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, May 22, 2015, by electronic and/or U.S.
First Class mail.

s/ Richard Loury
Case Manager